UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES FONTANA,

               Plaintiff                                  Case No. 20-10199

v.                                             HON. MARK A. GOLDSMITH

LINCOLN PARK POLICE DEPARTMENT, et al.,

               Defendants.

_____/

**OPINION & ORDER**
**(1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 35) AS TO THE FEDERAL CLAIMS AGAINST THEM AND (2) DISMISSING WITHOUT PREJUDICE PLAINTIFF'S STATE-LAW CLAIMS**

This matter is before the Court on Defendants' motion for summary judgment (Dkt. 35). For the foregoing reasons, the Court grants Defendants' motion as to the federal claims against them and dismisses without prejudice Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(c)(3).[1]

## I. BACKGROUND

Plaintiff James Fontana brings this employment-discrimination action against (i) the Lincoln Park Police Department, which is his former employer; (ii) the City of Lincoln Park; and (iii) Raymond Watters, who is the chief of the police department and Fontana's former supervisor. Compl. (Dkt. 1). Fontana alleges that, due to his disability—which is work-related Post Traumatic Stress Disorder (PTSD)—and due to his age, he was demoted from patrol officer to sergeant, subjected to a hostile work environment, and constructively discharged or terminated. Resp. at 20.

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Plaintiff's response (Dkt. 38) and Defendants' reply (Dkt. 41).

Fontana, who is 59 years old, was employed with the Lincoln Park Police Department from April 12, 1999 to June 25, 2021. Fontana Dep. at 6, 8 (Dkt. 35-5); Termination Letter (Dkt. 41-2). During his employment, Fontana was subject to an investigation based on an incident that occurred on July 13, 2019. On that day, Fontana, acting as the officer in charge, authorized the arrest of an individual who injured himself before being taken into custody and then threatened to kill himself once detained. Fontana Dep. at 61, 64, 72–75, 80–82. On July 23, 2019, a patrol lieutenant and deputy chief interviewed Fontana regarding the incident. Id. at 59; Watters Dep. at 25 (Dkt. 38-14). Fontana testified that he had a "breakdown" during the interview and started crying uncontrollably. Fontana Dep. at 85–86. After the interview ended, Fontana told Watters that he needed professional help and that he had anxiety issues with making decisions. Id. at 89; Watters Dep. at 37. Watters provided Fontana the phone number for a professional counseling service. Fontana Dep. at 89; Watters Dep. at 27. On or around the same day as his interview, Watters also gave him a book titled "Emotional Survival for Law Enforcement." Resp. at 8; Watters Dep. at 30–31.

Fontana contacted the professional counseling service that Watters told him about, and he was referred to a therapist, whom he saw on July 25, 2019. Fontana Dep. at 154. On that day, the therapist diagnosed Fontana with PTSD. Id. at 154–155. On the same day that Fontana received this diagnosis, he contacted Watters and informed Watters that he had PTSD and that it was caused by working for the police department. Id. at 155.

Fontana attempted to return to work on August 19, 2019. Id. at 92, 158. That day, he met with Watters and Sergeant Gerald Martin, the union president for command officers. Watters Dep. at 77. Fontana was told that he had been relieved of his duties as sergeant and placed on administrative leave pending the outcome of the disciplinary investigation. Id.; Fontana Dep. at

163.  Upon hearing this, Fontana again told Watters that he had PTSD.  Watters Dep. at 77–78; Fontana Dep. at 163.  During his entire period of employment with the police department, Fontana told only the following individuals about his PTSD diagnosis: Watters, Martin, and Lieutenant Couvreur, the former union president.  Fontana Dep. at 160.

The disciplinary investigation determined that, in his handling of the arrestee, Fontana violated the Lincoln Park jail policy, the Lincoln Park psychiatric policy, and the department standards for professional conduct and competency.  8/19/19 Letter from Raymond Watters to James Fontana at 4–5 (Dkt. 35-3).  On August 23, 2019, Fontana signed an agreement, in the form of a letter of understanding, to resolve the pending disciplinary charges against him.  Letter of Understanding (Dkt. 35-4).  The agreement provided that Fontana would be demoted to the position of patrol officer with full seniority and that he would not have to serve a two-day suspension that had been issued the previous month for another disciplinary charge.  Id.  It also stated that Fontana released the City and its agents from all claims that arose or were connected with the agreement and his demotion.  Id.

Fontana's employment was terminated on June 25, 2021, after he had not returned to his position at the police department in about two years.  Termination Letter.  On October 24, 2019, Fontana filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), in which he alleged that he was demoted because of his disability and his age.  EEOC Charge (Dkt. 35-2).

Fontana later filed this action.  He brings the following federal claims: a disability discrimination claim under the Americans with Disabilities Act (ADA) and an age and disability discrimination claim under Title VII.  Compl. ¶¶ 52–76.  He also brings two state-law claims: a disability discrimination claim under Michigan's Persons with Disabilities Civil Rights Act

(PWDCRA) and an age discrimination claim under Michigan's Elliott-Larsen Civil Rights Act (ELCRA). Id. ¶¶ 77–92.

## II. ANALYSIS[2]

Defendants argue that they are entitled to summary judgment for several reasons. First, the letter of understanding Fontana signed contained a release provision, which precludes claims arising out of his demotion. Mot. at 7–8. Second, Fontana cannot make out a prima facie case of disability discrimination because he is not qualified, and Defendants did not have knowledge of his disability. Id. at 12–14, 18–22. Even if Fontana could make out a prima facie case, Defendants provided a legitimate non-discriminatory reason for Fontana's demotion, and there is insufficient evidence that this reason is pretextual. Id. at 14–21. Third, Fontana cannot prevail on his hostile work environment claim, or any claim unrelated to his demotion, because he did not include the claims in his EEOC charge. Id. at 6. And even if he had, summary judgment is warranted because Fontana cannot show that he was harassed based on his disability. Id. at 21–24; Reply at 9–10. Fourth, Fontana's Title VII claim fails because the statute does not protect against disability or age discrimination. Id. at 10. The Court addresses each argument in turn.

### A. Release Agreement

Fontana, his union representative, and Watters signed a letter of understanding that provided that Fontana would be demoted to the position of patrol officer with full seniority and that he

---

[2] In assessing whether Defendants are entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

would not have to serve a two-day suspension that he had been previously issued for another disciplinary charge.  Letter of Understanding.  It also stated the following:

> The Employee does hereby for himself, release and forever discharge the city and all of its officers, employees, agents, attorneys, assigns and elected officials from all claims, whether past, present or future, which arose or are in any way connected with this Agreement and his demotion.

Id.  Defendants contend that this release agreement bars Fontana from pursuing any claims against them arising out of his demotion.  Mot. at 7–8.  Fontana raises two challenges to the release agreement: that it is ambiguous and that there is a factual dispute as to whether he signed it under duress.  Resp. at 16–18.

"Federal law controls the validity of a release of a federal cause of action."  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1481 (6th Cir. 1990).  Release agreements are contracts, and, therefore, in determining whether a plaintiff has waived his or her right to continue with a federal law claim, courts apply "normal contract principles."  Schumacher v. AK Steel Corp. Retirement Accumulation Pension Plan, 711 F.3d 675 (6th Cir. 2013).  The scope of a release is governed by the intent of the parties, which courts determine by looking to the language of the release itself.  Barden Detroit Casino, L.L.C. v. City of Detroit, 59 F. Supp. 2d 641, 659 (E.D. Mich. 1999).  "If the language is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument.  However, if the scope of a release agreement is ambiguous, the question thus becomes one of determining the intention of the parties."  Taggart v. United States, 880 F.2d 867, 870 (6th Cir. 1989).

The Court finds that the agreement is not ambiguous.  "Contract language is ambiguous if it is subject to two reasonable interpretations."  Schachner v. Blue Cross and Blue Shield of Ohio, 77 F.3d 889, 893 (6th Cir. 1996).  The agreement here is not subject to two reasonable interpretations.

It clearly expressed Fontana's intent to release the City and its agents "from <u>all</u> claims, whether past, present or future, which arose or are in any way connected with this Agreement and his demotion."  Letter of Understanding (emphasis added); <u>see also</u> <u>Soltis v. J.C. Penney Corp., Inc.</u>, 635 F. App'x 245, 248 (6th Cir. 2015) (finding unambiguous an agreement to release an employer "from any and all claims, . . . demands, [and] causes of action . . . of every nature whatsoever known or unknown, arising out of or in connection with [plaintiff's] employment"); <u>Gascho</u>, 400 F. App'x at 982 (finding that language releasing defendant "from any and all claims of any nature . . . based on any fact, circumstance or event occurring or existing at or before [plaintiff's] execution of this Agreement" "leave[s] no room for doubt about its meaning").  Thus, the release encompasses Fontana's age and disability discrimination claims based on his demotion.

Fontana, however, argues that the release is ambiguous because, following the paragraph that releases the City and its agents from all claims, there is a paragraph that states the following: "This Agreement shall serve as a final and complete agreement of the Parties with regard to all matters associated with the incident on July 13, 2019."  Letter of Understanding.  Fontana asserts that these two paragraphs are contradictory because one states that the agreement applies to all matters involving his demotion, while the other states that it applies only to the July 13, 2019 incident that led to his demotion.  Resp. at 17.  These two paragraphs, however, do not conflict.  The second paragraph does not state that a release of claims applies <u>solely</u> to the incident that led to Fontana's demotion.  Rather, it simply states that the document represents a complete agreement regarding the incident.  This paragraph is fully consistent with the preceding one releasing the City and its agents from all claims arising from the demotion.

Fontana next challenges the applicability of the release by stating that there is a factual dispute as to whether he was forced to sign the release under duress.  Resp. at 16–17.  The United States

Court of Appeals for the Sixth Circuit has held that releases of discrimination claims, including those brought under the ADA and Title VII, are enforceable if "knowingly and voluntarily executed." Adams v. Philip Morris, Inc., 67 F.3d 580, 583 (6th Cir. 1995). "A totality of the circumstances test determines whether an employee has knowingly and voluntarily executed a release of [his or her] [federal law] claims and thus may not rescind it on duress grounds." Gascho v. Scheurer Hosp., 400 F. App'x 978, 981 (6th Cir. 2010). Courts consider the following factors in making this assessment: (i) the plaintiff's experience, background, and education; (ii) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (iii) the clarity of the waiver; (iv) consideration for the waiver; and (v) the totality of the circumstances. Adams, 67 F.3d at 583. "The knowing-and-voluntary inquiry is a totality-of-circumstances test, however, and it allows claimants to invoke other considerations, including the risk that the waiver was a product of duress and thus involuntary." Gascho, 400 F. App'x at 982. Duress involves an unlawful or "wrongful act or threat" that overcomes the free will of the victim. Id.

Fontana does not discuss any of the enumerated factors in his response and instead focuses on economic duress. He points to his deposition, in which he stated that two union representatives—who were not employed by the City—told him that the City wanted him to sign the agreement and that, if he did not, he would be fired. Fontana Dep. at 108–110.

Courts have found this type of "economic pressure" is insufficient to demonstrate unlawful coercion. See Gascho, 400 F. App'x at 982–983 (explaining that the plaintiff's belief "that [she] had no choice" in signing a release agreement, "in view of the economic benefits offered and the risk of economic hardship if she declined the offer, does not by itself state a claim [for duress] because this kind of threat is an accepted part of the bargaining process"); Adams, 67 F.3d at 583

(determining, in case in which plaintiff cited "extreme economic distress" as the motivating factor in his decision to sign a release, that "[a]though he certainly felt some economic pressure to accept . . . [a] severance package and settle any potential claims he might have against [his employer], this pressure does not rise to the level of economic duress"); VKK Corp. v. Nat'l Football League, 244 F.3d 114, 123 (2d Cir. 2001) ("Because an element of economic duress is thus present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases."); Parker v. Key Plastics, 68 F. Supp. 2d 818, 826 (E.D. Mich. 1999) (finding, in case in which plaintiff testified that he understood "that [signing the release] was the only way that I could get my job back" and that he was "under duress for my income purposes," that this economic pressure failed to establish that the execution of the agreement was not knowing or voluntary).  In defense of his economic duress theory, Fontana simply asserts that whether he was "illegally compelled or coerced" to sign the release based on fear of serious injury to his person, reputation, or future is a factual question. Resp. at 16–17.  But given the caselaw, he has not produced sufficient evidence to create a factual question as to whether he signed the release under duress. [3]

Moreover, the above factors weigh in favor of finding that Fontana knowingly and voluntarily waived his right to bring claims arising from his demotion.  The agreement is plain, straightforward, and unambiguous, and it is easily understandable by someone with Fontana's experience and background.  See Adams, 67 F.3d at 583 (explaining that these factors support

---

[3] Fontana also contends that, because he told Watters that he had PTSD and because Watters gave him a book on emotional survival, there is a factual dispute "as to whether Defendant [Watters] harassed and discriminated against [him] based on his disability to force him to sign the release." Resp. at 17.  He seems to suggest that these facts are evidence of disability discrimination, which, in turn, serve as evidence of unlawful coercion.  But the fact that, at the time they signed the agreement, Watters knew that Fontana had PTSD, and Watters gave Fontana a book on emotional survival do not indicate that Fontana was unlawfully compelled or coerced to sign the release.

finding that the release was entered into knowingly and voluntarily); Howard v. DaimlerChrysler Corp., 290 F. Supp. 2d 784, 790–791 (E.D. Mich. 2003) (finding that clarity of release, which covered "any and all claims" that plaintiff had or may have "by reason of any matter, cause or thing related to or connected with his employment with, or separation from" his employer supported a finding of voluntariness). While Fontana estimated that he had a day to consider the agreement and did not consult with a lawyer, he did not state that he was given insufficient time to consider his options. And he was assisted by two union officials, who included a business agent and his command union representation, before he signed the agreement. Fontana Dep. at 103, 106; see also Sako v. Ohip Dep't of Admin. Servs., 278 F. App'x 514, 518–519 (6th Cir. 2008) (noting, in determining whether a release was knowingly and voluntarily executed, that while plaintiff was not represented by counsel, he was assisted by union officials). He testified that he did not have any questions that his union representation could not answer. Id. 105. Further, consideration supported the agreement. In exchange for releasing all claims against the City and its agents arising from the demotion, the City agreed to withdraw pending disciplinary charges against Fontana, consider the disciplinary matter withdrawn, and permit Fontana to avoid serving a two-day suspension he had previously been issued. See Letter of Understanding. Fontana does not challenge the fairness of this consideration or argue that the release produced a disproportionate exchange of benefits. See Gascho, 400 F. App'x at 982.

Because the agreement's language and scope are clear and because Fontana has not created a triable issue that he did not knowingly and voluntarily execute the agreement, Fontana's claims are barred to the extent that they are based on his demotion. Even if the Court were to consider the substance of these claims, Defendants are entitled to summary judgment for the reasons discussed below.

**B.  ADA Discrimination Claim**

Fontana alleges that Defendants demoted him because of his disability, which is PTSD, in violation of the ADA.[4]  Resp. at 18–19; see also Fontana Dep. at 135 (stating that Fontana's disability is PTSD).  The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

Fontana does not assert that he has direct evidence that he was discriminated against on the basis of his disability.  When a plaintiff seeks to establish discrimination through indirect evidence, the McDonnell Douglas burden-shifting framework applies.  Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1105 (6th Cir. 2008).  Under this framework, a plaintiff must first establish a prima facie case of disability discrimination.  Id.  If the plaintiff does so, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions.  Id.  If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination.  Id.  Although intermediate

---

[4] In his complaint, Fontana alleged that he was suspended based on his disability.  Compl. ¶ 60.  It is not clear if he is referring to the two-day suspension that he was issued on July 17, 2019, based on the incident that led to his demotion, or if he is referring to a 30-day suspension that he was issued for another incident in 2017.  See id. ¶ 17 (referring to 2017 incident), ¶ 19 (referring to 2017 incident), ¶ 29 (referring to 2019 incident).  Defendants argue that the 30-day suspension cannot constitute an adverse employment action for Fontana's ADA claim because he did not include it in his EEOC charge, and there is no evidence that it was the result of Fontana's disability.  Mot. at 20–21.  They also argue that the two-day suspension cannot constitute an adverse employment action because, pursuant to the release agreement, he never served it.  Id. at 15 n.1.  Fontana does not address either of these arguments in his response, and, therefore, he may be deemed to have waived any claim based on these suspensions.  See Brown v. VHS of Mich., Inc., 545 F. App'x 368, 372 (6th Cir. 2013).  Even if the Court were to consider the claims, they would fail, as there is no evidence that Fontana was suspended on the basis of his disability or that Defendants knew of Fontana's PTSD at the time the suspensions were issued.

evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). The plaintiff must show that his or her disability was a "but for" cause of the adverse employment action. Bailey v. Real Time Staffing Servs., Inc., 543 F. App'x 520, 523 (6th Cir. 2013); Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 321 (6th Cir. 2012).[5]

1. **Prima Facie Case**

To establish a prima facie case of disability discrimination, a plaintiff must show that: (i) he or she is disabled; (ii) he or she is otherwise qualified for the position, with or without reasonable accommodation; (iii) he or she suffered an adverse employment decision; (iv) the employer knew or had reason to know of the plaintiff's disability; and (v) the position remained open while the employer sought other applicants, or the disabled individual was replaced. Whitfield v. Tennessee, 639 F.3d 2543, 258–259 (6th Cir. 2011). A plaintiff may also satisfy the fifth element by showing that similarly situated nondisabled employees were treated more favorably. Rosebrough v. Buckeye Valley High School, 690 F.3d 427, 431 n.2 (6th Cir. 2012). "Because the prima facie case is meant simply to force a defendant to proceed with its case . . . the plaintiff's burden at the prima facie stage is not onerous and poses a burden easily met." Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 776 (6th Cir. 2016) (internal citations omitted).

---

[5] Defendants state that Fontana must show that the adverse employment action occurred "solely because of his handicap." Mot. at 11 (quoting Donald v Sybra, 667 F.3d 757, 763 (6th Cir. 2012)). However, in Lewis, the court abrogated the requirement that an ADA plaintiff show that his or her disability was the sole reason for the adverse employment action and held that, instead, the plaintiff must satisfy the but-for standard. 681 F.3d at 315–316.

Defendants focus on the second and fourth elements.  They argue that Fontana cannot establish that he was qualified or that Defendants knew or had reason to know about his PTSD.  Mot. at 9–10, 12–14.

### a.  Qualified

As defined in the statute, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  An individual who cannot perform the essential functions of a job is not qualified for that job, and, in such cases, the ADA does not apply. Dietelbach v. Ohio Edison Co., 1 F. App'x 435, 436–437 (6th Cir. 2001).  Defendants assert that Fontana is not qualified, given that he testified that he is incapable of working anywhere because of his PTSD.  Mot. at 10 (citing Fontana Dep. at 7, 135–136).  Fontana also testified that, because of his diagnosis of PTSD, there are no circumstances under which he would be able to return to his employment at the police department.  Fontana Dep. at 8.  And he stated that it is the professional opinion of his doctor and his psychotherapist that he cannot return to work as a police officer.  Id. at 136.

Defendants focus on these statements that Fontana made one-and-a-half years after his demotion.  The relevant time for determining whether a plaintiff is a qualified individual with a disability, however, is at the time of the employment decision.  See Kocsis v. Multi–Care Mgmt., Inc., 97 F.3d 876, 884 (6th Cir. 1996).  Therefore, the question is not whether Fontana was qualified at the time of his deposition but, rather, whether he was qualified at the time of his demotion. Fontana asserts that he was qualified to work at the police department, as demonstrated by the fact that he had been working there for several years, and that whatever he is unable to do is not a function of his disability, but rather the allegedly hostile work environment to which

12

Defendants subjected him. Resp. at 14. He states that one could infer that it is not his disability that prevents him from working but rather the police department's mistreatment of him. Id.

The Court determines that there is a triable issue as to whether, at the time of his demotion, Fontana could perform the essential functions of his position. At that time, Fontana had been working for the police department for about 20 years and had been working as a sergeant for four years. Witnesses testified that Fontana was able to perform his job as well as other individuals in the police department and to do so without manifestation of a disability. See Couvreur Dep. at 34, 37 (Dkt. 38-5); Wise Dep. at 30 (Dkt. 38-8); Sparks Dep. at 49, 50 (Dkt. 38-7). And Defendants rely on that testimony in arguing that individuals at the police department had no knowledge of Fontana's disability. See Couvreur Dep. at 34; Sparks Dep. at 32. Thus, Fontana's testimony does not entitle Defendants to judgment as a matter of law when Fontana has created a factual question as to whether, at the time of his demotion, he was qualified.[6]

### b. Knowledge of Disability

To establish the fourth element of a prima facie case of disability discrimination, a plaintiff must show that his or her employer knew or had reason to know he or she had a disability. Whitfield, 639 F.3d at 258–259. When the adverse employment action is a demotion, a plaintiff "must demonstrate that the individual decisionmakers responsible for [his or her] demotion had

---

[6] Defendants also argue that Fontana's testimony reveals that he cannot regularly attend his job, and, because regular attendance is an essential function of his job, he is not qualified. For this proposition, they rely on Gamble v. JP Morgan Chase & Co., 689 F. App'x 397, 403 (6th Cir. 2017). In Gamble, however, extensive evidence established that the plaintiff was not released to work by his doctor and remained completely disabled at the time of his termination. 689 F. App'x at 403. In that circumstance, prior to and at the time of the adverse employment action, the plaintiff was unable to regularly attend his job. Here, there is no evidence that, at the time of his demotion, Fontana was not able to work or complete the essential function of regular attendance. In fact, Fontana appeared for work on August 19, 2019—four days prior to his demotion—before being told that he had been placed on administrative leave.

knowledge of [his or her] disability." <u>Messenheimer v. Coastal Pet Prods., Inc.</u>, 764 F. App'x 517, 519 (6th Cir. 2019) (punctuation modified).

As Fontana notes, there is a factual question as to whether Watters or another city employee was the individual responsible for his demotion.  Fontana points to the fact that Watters signed the release agreement pursuant to which he was demoted and the fact that union representatives told him that the police department—led by Watters—wanted him to agree to the demotion or be terminated.  Resp. at 19.  But according to Watters, he does not issue demotions on his own but rather first sends his findings to the city's labor attorney to review.  Watters Dep. at 8.

The record indicates that Watters knew of Fontana's PTSD as of July 25, 2019—and, therefore, knew of Fontana's PTSD before Fontana was demoted in August 2019.  "An employer has notice of the employee's disability when the employee tells the employer that he is disabled." <u>Hammon v. DHL Airways, Inc.</u>, 165 F.3d 441, 450 (6th Cir. 1999).  "Of course, the employee need not use the word 'disabled,' but the employer must know enough information about the employee's condition to conclude that [he or she] is disabled." <u>Cady v. Remington Arms Co.</u>, 665 F. App'x 413, 418 (6th Cir. 2016).  "Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." <u>Id.</u>  It is undisputed that, twice before signing the agreement pursuant to which he was demoted, Fontana told Watters that he had been diagnosed with PTSD: once on the day that he received his diagnosis, Fontana Dep. at 155, and once on the day that he attempted to return to work but was informed that he had been placed on administrative leave pending the outcome of the disciplinary investigation, <u>id.</u> at 163; Watters Dep. at 77–78.  Therefore, there is a material factual question as to whether Watters was the decisionmaker with respect to Fontana's demotion and whether Watters knew of Fontana's disability before the demotion.

14

### 2. Legitimate, Nondiscriminatory Reason

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action.  Talley, 542 F.3d at 1105.  Although the defendant does not need to persuade the court that it was actually motivated by the proffered reasons, it must raise a genuine issue of fact as to whether it discriminated against the plaintiff.  Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 666 (6th Cir. 2000).

Defendants contend that even if Fontana can establish a prima facie case of disability discrimination, they have offered a legitimate, non-discriminatory reason for his demotion: Fontana's violation of municipal and departmental policies in his handling of the arrestee who engaged in self-harm behaviors on July 13, 2019, along with his disciplinary history.  Mot. at 16. The investigation of Fontana's handling of the arrestee determined that Fontana violated the Lincoln Park jail policy, the Lincoln Park psychiatric policy, and department standards for professional conduct and competency.  8/19/19 Letter from Raymond Watters to James Fontana at 4 (reporting results of investigation).[7]  According to Defendants, Fontana violated these policies when (i) he ordered the arrest of an individual despite dispatch reporting that the complaining witness refused to cooperate with the investigation and/or return to the scene, and (ii) he failed to timely obtain a mental evaluation of the individual, who was known by Fontana to have mental

---

[7] The psychiatric policy states that "it is the policy of the police department to assist persons who are in need of psychiatric help" and that "if a person had an obvious psychiatric condition with an underlying psychiatric history . . . the ambulance personnel should take the patient to the appropriate local medical facility."  Lincoln Park Police Department Psychiatric Commitments Policy (Dkt. 35-6).  The jail policy states that "if a prisoner's condition indicates that he may attempt to take his life, or his unusual or bizarre behavior indicates that he may be mentally ill, he shall be taken to an area hospital for evaluation."  Lincoln Park Police Department Jail Policy (Dkt. 35-7).

health issues and who repeatedly engaged in self-harm behaviors while in custody. Mot. at 17. In addition, Defendants assert that Fontana's disciplinary history, which included three written reprimands and three suspensions issued between 2012 and 2019, informed the decision to demote him. Id. at 16.

Poor performance is a legitimate, nondiscriminatory reason for demoting an employee. Tennial v. United Parcel Serv., 840 F.3d 292, 303 (6th Cir. 2016) (finding that a "performance-based reason . . . supported by numerous performance failures" was a legitimate non-discriminatory reason for the plaintiff's demotion); see also Stockman v. Oakcrest Dental Ctr., P.C., 480 F.3d 791, 802 (6th Cir. 2007) (finding that, when employer set forth specific facts related to poor performance that it stated it relied on in terminating employee, it provided a legitimate, nondiscriminatory explanation for the termination). Documented policy violations may also constitute a legitimate, nondiscriminatory reason for an adverse employment action. See Sokolnicki v. Cingular Wireless, LLC, 331 F. App'x 362, 367 (6th Cir. 2009). Accordingly, Defendants' reasons for demoting Fontana satisfy their burden of proof at this stage.

### 3. Pretext

Because Defendants have offered a legitimate, nondiscriminatory reason for Fontana's demotion, the burden shifts to Fontana to raise a genuine issue of material fact as to whether Defendants' proffered reason was pretext for discriminating against him because of his disability. Messenheimer v. Coastal Pet Prods., Inc., 764 F. App'x 517, 520 (6th Cir. 2019). To survive summary judgment, a plaintiff must "provide not only evidence from which the finder of fact could conclude that [the employer's] proffered reason is false, but also evidence from which the fact finder could conclude that [the employer's] action was intentionally discriminatory." Smith v. Allstate Ins. Co., 195 F. App'x 389, 395 (6th Cir. 2006).

"A plaintiff may establish pretext by showing (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the actions; or (3) that the proffered reason was insufficient to motivate the actions."  Hopkins v. Elec. Data Sys. Corp., 196 F.3d 655, 662 (6th Cir. 1999).

### a.  Treated Less Favorably Than Similarly Situated Employees

The third method of showing pretext—that the proffered reason was insufficient to motivate the actions—"ordinarily [] consists of evidence that other employees, particularly employees not in the protected class," were not subject to the same adverse employment action as the plaintiff "even though they engaged in substantially identical conduct to that which the employer contends motivated" the plaintiff's adverse employment action.  Jones v. Potter, 488 F.3d 397, 407 (6th Cir. 2007).

Fontana does not state which method of showing pretext he relies upon, but he seems to rely at least in part on this third method.  In support of his argument that there is a factual issue that Defendants' proffered reasons are pretextual, he states that he was treated differently than another police officer, Sergeant Victoria Lyles, who engaged in similar conduct.  Resp. at 22.  Fontana contends that, in handling an arrestee who threatened to kill himself, Lyles did not send the arrestee to the hospital for a mental health evaluation but, instead, placed the individual in a restraint chair. Id.; Fontana Dep. at 125. He states that she therefore violated the police department's rules and regulations but was not disciplined or investigated.  Resp. at 22; Fontana Dep. at 125.

To be similarly situated, the individual with whom the plaintiff seeks to compare his or her treatment "need not be identical in every way."  Tennial, 840 F.3d at 304.  Rather, the plaintiff must show that the comparator is "similarly situated in all relevant respects."  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354 (6th Cir.1998) (punctuation modified) (emphasis

in original); see also Johnson v. Kroger Co., 319 F.3d 858, 867 (6th Cir. 2003) (using the Ercegovich similarly situated analysis to evaluate pretext). In the disciplinary context, employees are "similarly situated" only if they have "engaged in acts of comparable seriousness." Wright v. Murray Guard, Inc., 455 F.3d 702, 710 (6th Cir. 2006). To make this assessment, courts look to factors such as whether the individuals "have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992). "When it comes to comparable seriousness, it is the particular conduct of the officers, not broad generalizations, that counts." Johnson v. Ohio Dep't of Public Safety, 942 F.3d 329, 331 (6th Cir. 2019). Whether individuals or entities are similarly situated is "generally a question of fact for the jury; however, where there is no genuine issue of fact that such a comparator exists, the court may decide this matter on summary judgment." JDC Mgmt., LLC v. Reich, 644 F. Supp. 2d 905, 927 (W.D. Mich. 2009); see also Mitchell, 964 F.2d at 584 (finding that defendants were entitled to summary judgment because the plaintiff failed to produce sufficient evidence to establish that her proposed comparator was similarly situated in all respects or that their conduct was of "comparable seriousness").

Defendants contend that Fontana is not similarly situated to Lyles in part because they had different disciplinary histories. Mot. at 19. At the time that she was involved with an arrestee who tried to harm himself, Lyles had no disciplinary history. Id. In contrast, at the time of the event preceding Fontana's demotion, Fontana had six prior disciplinary incidents. Id. at 1–2. Fontana does not address this difference in disciplinary history, and he does not argue that he and Lyles are similarly situated despite it. Accordingly, Fontana has not created an issue of fact that he and

Lyles are similarly situated for disciplinary purposes.  See Tennial, 840 F.3d at 304 (finding that employees were not similarly situated because of differences in experience and disciplinary history); Campbell v. Hamilton Cnty., 23 F. App'x 318, 325 (6th Cir. 2001) (holding that differences in disciplinary history may establish that two employees are not similarly situated).

Moreover, Defendants contend that the incidents involving Fontana and Lyles were not of comparable seriousness for several reasons.  First, the suspect in Lyles's situation did not twice require EMS to be called because of self-inflicted physical injuries.  Mot. at 18–20.  Second, the suspect that Lyles dealt with apologized after he attempted to harm himself and did not engage in any other self-harm behaviors, while the suspect that Fontana dealt with tried to harm himself repeatedly.  Id.  Third, unlike in Lyles's case, Fontana knew that the suspect had a history of mental illness.  Id.  Fourth, Fontana authorized the arrest of an individual in the absence of a complaining witness, and Lyles did not.  Id.  Fontana does not address these differences but rather simply states that the fact that Lyles was not demoted for the situation in which she was involved raises a factual dispute as to whether Defendants treated Fontana less favorably than her.  Resp. at 22.  This conclusory statement is insufficient to create a factual issue as to whether he and Lyles were similarly situated for disciplinary purposes.[8]

---

[8] In his deposition and response, Fontana refers to other incidents in which police officers allegedly engaged in similar conduct but were treated more favorably.  However, these incidents do not involve similar conduct.  Fontana testified that Lyles ignored the medical needs of a detainee who reported that he had a broken hand but was not disciplined for failing to obtain medical attention for the detainee.  Fontana Dep. at 31, 126–127.  But Fontana was not disciplined for failing to obtain medical attention in the incident preceding his demotion, as he arranged for EMS to treat the suspect twice.  Fontana Dep. at 133.  Moreover, in his response, Fontana asserts that Defendants treated Lyles differently than him when she engaged in similar conduct in situations that involved a missing child and parking lot tickets.  Resp. at 6–7.  But this contradicts Fontana's testimony, in which he stated that he was not aware of an officer who engaged in the same or similar conduct in these situations.  Fontana Dep. at 32, 55–57.

**b.   Lack of Policy Violations**

In further support of his argument that Defendants' proffered reason is pretextual, Fontana

points to the fact that Courveur testified that Fontana did not violate departmental policy when

Fontana authorized the arrest in the incident leading to his demotion.  Resp. at 22.  He states that

witnesses testified that policies are not clear and that different officers handle situations in different

ways.  Id.  But Fontana does not explain how this evidence indicates that a reasonable jury could

conclude that Defendants' reasons for his demotion were not only false—meaning, for example,

that Fontana did not violate departmental policies and standards in his arrest and handling of the

arrestee—but also a pretext for disability discrimination.

Because Fontana has failed to establish a genuine dispute of material fact that Defendants'

reasons for demoting him were pretextual, Defendants are entitled to summary judgment on his

ADA claim based on his demotion.

**C.   ADA Hostile Work Environment Claim**

In addition to alleging that he was demoted because of his disability, Fontana alleges that he

was subject to a hostile work environment based on his disability.  Resp. at 18–20.  Defendants

contend that Fontana cannot prevail on his hostile work environment claim because he did not

include this claim in his EEOC charge, and this claim cannot reasonably be expected to grow out

of the charge.  Id.  They also assert that, even if the Court were to consider the claim, there is no

---

Fontana also refers to the testimony of Officer Alejandro Serna, who stated that Fontana was
disciplined for not sending out multiple officers to search for a missing child, but several years
ago, Lieutenant Lyles, an officer who is married to Sergeant Lyles, sent out only one patrol car to
search for a missing child and was not disciplined.  Serna Dep. at 74–75 (Dkt. 38-9).  These sparse
details do not raise sufficient factual disputes on the issue of whether Fontana has been treated
differently than similarly situated colleagues to defeat summary judgment.

evidence that Fontana was subject to a hostile work environment based on his disability.  Id. at 21–22.

Under the ADA, a claimant who wishes to bring a lawsuit claiming a violation of the ADA must file a charge of discrimination with the EEOC within 300 days of the alleged discrimination. 42 U.S.C. § 12117(a); Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 309 (6th Cir. 2000). Only claims that are included in the charge or are "reasonably related to or grow out of the factual allegations in the EEOC charge" may be heard in federal court.  Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 361–362 (6th Cir. 2010).

Fontana did not include a hostile work environment claim in his EEOC charge.  Rather, he alleged the following:

> I began working for the above-named employer [Lincoln Park Police Department] in 1998 and am currently employed as a patrol officer.  On 8/23/19, I was demoted from Sergeant to patrol officer due to an alleged policy violation during an arrest. I am aware of a younger Sergeant, without a disability, who violated policy without consequence. I believe I was demoted because I have a disability in violation of the Americans with Disabilities Act, as amended, and due to my age, 57, in violation of the Age Discrimination in Employment Act, as amended.

EEOC Charge.

Even if a hostile work environment claim could reasonably be expected to grow out of the allegations that reference solely a demotion, Defendants are entitled to summary judgment on this claim because Fontana cannot make out a prima facie case.  To maintain an action for a hostile work environment under the ADA, employees must demonstrate that (i) they were disabled; (ii) they were subject to unwelcome harassment; (iii) the harassment was based on their disability; (iv) the harassment unreasonably interfered with their work performance; and (v) the defendant either knew or should have known about the harassment and failed to take corrective measures.  Trepka v. Bd. of Educ., 28 F. App'x 455 (6th Cir. 2002).  Regarding the third element, the Sixth Circuit

has explained that its "harassment jurisprudence requires that [courts] distinguish between harassment and discriminatory harassment." Id.  An employee, therefore, "must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class." Id.

For purposes of the motion for summary judgment, Defendants do not dispute that Fontana was subject to harassment.  Mot. at 22.  Instead, they focus on the third element, arguing that Fontana cannot show that he was harassed based on his PTSD because, at the time of the alleged harassment, no one knew of his PTSD.  Mot. at 21–22.  Defendants maintain that no one knew of Fontana's PTSD until July 25, 2019—the date that he informed Watters of his diagnosis.  Id.

Fontana, however, argues that, in focusing on the date on which he first informed Watters of his diagnosis, Defendants too narrowly construe "knowledge" of his disability.  Resp. at 19–20.  It is true that a diagnosis is not the only way for an employer to know about an employee's disability. See Yarberry, 625 F. App'x at 737–738.  As discussed above, relevant information can include a treatment plan, apparent severe symptoms, and physician-imposed work restrictions.  Id.  Fontana contends that material factual questions exist as to whether his harassment was based on his disability, regardless of when he was diagnosed, because (i) Watters knew of Fontana's stuttering, which witnesses stated happened when Fontana is stressed, during the entire course of Fontana's employment, and (ii) Defendants knew about Fontana's anxiety with respect to his employment as early as July 2019.  Resp. at 19–20.

For the first point, Watters testified that he knew about Fontana's stutter, and current and former Lincoln Park Police Department officers testified that Fontana stuttered when he was nervous or excited.  Watters Dep. at 72–73; Couvreur Dep. at 87; Wise Dep. at 98–99.  Fontana does not expressly explain or point to evidence that explains the relationship between his stutter

and his PTSD.  He asserts that his stutter is a "byproduct of [his] condition," Resp. at 3, and he testified that he sometimes stutters when he "get[s] excited."  Fontana Dep. at 151–152.  Thus, this is not a situation in which an employee's symptoms were "severe enough to alert" the employer, giving it either knowledge or "some generalized notion" of a disability.  Nilles v. Givaudan Flavors Corp., 521 F. App'x 364, 369 (6th Cir. 2013).  Moreover, knowledge of Fontana's stutter does not indicate that Fontana's alleged harassers knew that Fontana had PTSD at the time of the harassing conduct or that they harassed Fontana based on Fontana's PTSD.  See Messenheimer, 764 F. App'x at 519 (explaining that "a general awareness of some symptoms" is not enough to show that an employer knows of an employee's disability).

For the second point, that Defendants knew about Fontana's anxiety as early as July 2019, Fontana seems to suggest that his anxiety is a manifestation of his PTSD, but he again does not expressly explain the connection between his anxiety and his PTSD.  And there is no indication in the record that Defendants knew that Fontana's anxiety was in any way related to his PTSD.[9]  See Hammon, 165 F.3d 441 at 450 (explaining that "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation").  The fact that Fontana informed Watters of his anxiety in July 2019 does not aid Fontana's hostile work environment claim: any alleged harassment must have occurred before July 2019 because Fontana stopped performing his duties sometime around that point.

Fontana does not set forth other evidence in support of his argument that Defendants are not entitled to summary judgment on his hostile work environment claim.  But, in reviewing the record,

---

[9] For the same reason, Fontana's other attempts to impute to Defendants knowledge of his disability based on knowledge of his anxiety do not help him establish a prima facie case.  See Resp. at 5 (referring to Couvreur's statement that Fontana was singled out because of his "'apparent weakness due to his anxiety'") (quoting Couvreur Dep. at 92–94).

the Court finds that there is no evidence that, at the time he was allegedly harassed, Defendants were hostile to Fontana based on his PTSD or that they knew that he had PTSD.  Current and former employees of the Lincoln Park Police Department testified that Watters and others called Fontana derogatory terms, that the deputy chief threatened to physically harm Fontana, that officers mocked Fontana's stutter, and that, while officers were subject to criticism for how they responded to calls, Fontana was criticized more often.  Sparks Dep. at 26–27, 44, 60–61, 65, 91; Wise Dep. at 9, 43, 71; Couvreur Dep. at 8, 43, 81–82, 88, 89–90.  But the evidence does not indicate that this conduct—which, understandably, was hurtful, upsetting, and degrading for Fontana—was based on Fontana's disability.  And nothing establishes that Fontana's alleged harassers knew of his PTSD before Fontana himself learned of it, which is when he was diagnosed in July 2019.  Fontana testified that, until he himself learned that he had PTSD upon receiving his diagnosis, there was no reason for anyone at the police department to know that he had PTSD.  Fontana Dep. at 92.  He did not resume his job responsibilities after this diagnosis, and so the alleged harassment preceded anyone's knowledge of his asserted disability.

Because Fontana cannot make out a prima facie case, Defendants are entitled to summary judgment on his hostile work environment claim under the ADA.  See Kocsis v. Multi–Care Mgmt., Inc., 97 F.3d 876, 884 (6th Cir. 1996) (explaining that an employer cannot discriminate based on a disability if it does not know of the disability).

### D.  Constructive Discharge/Employment Termination Claim

In addition to arguing that a hostile work environment claim can reasonably be expected to grow out of his EEOC charge, Fontana asserts in his response that employment termination is an adverse action that can reasonably be expected to grow out of the charge.  Resp. at 21.  Elsewhere

in his response, he asserts that he was constructively discharged due to his disability and his age. Id. at 20, 21–22.

Regardless of whether Fontana attempts to allege that he was constructively discharged or that Defendants unlawfully terminated him, he cannot prevail on these claims because he asserted them for the first time in response to Defendants' motion for summary judgment.  His complaint alleged solely that he was suspended and demoted based on his disability and his age, see Compl. ¶¶ 60, 82, 88, and that he was subject to a hostile work environment based on his disability and his age, see id. ¶¶ 73–74.  As Defendants note in their reply, see Reply at 8–9, he did not allege either that he was terminated or that he was constructively discharged due to his disability and his age until his response to Defendants' motion for summary judgment.  A plaintiff may not expand his or her claims to assert new theories for the first time in response to a summary judgment motion. Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 400 (6th Cir. 2007); see also Rafferty v. Trumbull Cnty., Ohio, 758 F. App'x 425, 429 (6th Cir. 2018) ("A district court does not err by failing to consider a claim that a plaintiff does not raise until her response to a motion for summary judgment."); Tucker v. Union of Needletrades, Industrial and Textile Employees, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).") (internal citation omitted).

Therefore, Defendants are entitled to summary judgment on Fontana's ADA claim to the extent the claim alleges that he was constructively discharged or terminated due to his disability.

### E.  Title VII Claims

Fontana brings a claim of age and disability discrimination under Title VII.  Compl. ¶¶ 52–76.

Title VII states that an employer shall not "fail or refuse to hire or . . . discharge any individual

with respect to his compensation, terms, conditions, or privileges of employment because of such

individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).  Accordingly,

Title VII does not cover age or disability discrimination claims.  <u>Clark v. City of Dublin, Ohio</u>,

178 F. App'x 522 (6th Cir. 2006).  Rather, "[t]he appropriate remedy for age and disability

discrimination claims comes from the ADEA [Age Discrimination in Employment Act] and ADA,

respectively." <u>Id.</u>

Fontana argues that his complaint states a prima facie case of age discrimination, even if it

asserts a claim under the incorrect statute.  Resp. at 15.  And he states that, pursuant to Federal

Rule of Civil Procedure 15(a), he is "entitled to amend his complaint to revise the language" and

that an amendment would not be futile.  <u>Id.</u>  But Fontana has not filed a motion to amend his

complaint.  He refers to the possibility of an amended complaint solely in his response to

Defendants' motion for summary judgment.  And, other than offering a conclusory statement that

the assertion of claims under Title VII is evidence that his prior counsel was ineffective, he does

not set forth the grounds on which he seeks to amend his complaint.

When a plaintiff includes in a brief opposing summary judgment a "bare request to amend"

and does not make an argument regarding the particular grounds on which amendment is sought,

"the district court [is] not required to construe the [plaintiff's] request in [its] brief as a motion to

amend, and [it] does not err in not doing so." <u>Willecke v. Kozel</u>, 395 F. App'x 160, 167–168 (6th

Cir. 2010); <u>see also</u> <u>PR Diamonds, Inc. v. Chandler</u>, 364 F.3d 671, 699 (6th Cir. 2004) (explaining

that "a bare request in an opposition to a motion to dismiss—without any indication of the

particular grounds on which amendment is sought, cf. Fed. R. Civ. P. 7(b)—does not constitute a motion within the contemplation of [Fed. R. Civ. P.] 15(a)"); Sherman v. Ludington, No. 91–3936, 1992 WL 158878, at *1 (6th Cir. July 7, 1992) (declining to permit the amendment of a complaint at the summary judgment stage because "the facts which formed the basis of plaintiff's 'new claims' were known to him from the time the original complaint was filed and should have been apparent from the outset"). Therefore, Defendants are entitled to summary judgment on Fontana's Title VII claims alleging age and disability discrimination.

## F. State-Law Claims

Because the Court grants Defendants' motion as to the federal claims, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over the remaining state-law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–727  (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

## III.  CONCLUSION

For the reasons stated above, the Court grants Defendants summary judgment on the federal claims against them and dismisses without prejudice Fontana's state-law claims pursuant to § 1367(c)(3).

SO ORDERED.

Dated: September 12, 2022
       Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge